Filed 1/24/23  P. v. Laws CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JEROME LAWS,<br><br>Defendant and Appellant. | F081267<br><br>(Super. Ct. No. BF165010A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# STATEMENT OF THE CASE

On July 25, 2019, an amended information charged Anthony Jerome Laws (appellant) with 14 counts, as follows: in count 10, murder (Pen. Code, § 187, subd. (a))[1]; in counts 1, 3, and 11, attempted murder (§§ 664/187, subd. (a)); in count 12, conspiracy to commit murder (§ 182, subd. (a)(1)); in counts 2 and 7, shooting at a motor vehicle (§ 246); in counts 4, 5, and 6, assault with a semi-automatic firearm (§ 245, subd. (b)); in counts 8, 9, and 13, possession of a firearm by a felon (§ 29800, subd. (a)(1)); and in count 15, with participation in a criminal street gang (§ 186.22, subd. (a)).[2] As to all counts, it was alleged appellant had a prior strike (§ 667, subds. (c)-(j)), a prior serious felony (§ 667, subd. (a)), and two prison priors (§ 667.5, subd. (b)). As to counts 1 through 13, it was alleged appellant committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). As to counts 1, 3, 10, 11, and 12, it was alleged that the crimes were willful, deliberate, and premeditated (§ 189). As to count 10, it was alleged that the murder was committed while appellant was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)). As to counts 8, 9, 13, and 15, it was alleged appellant had inflicted great bodily injury (§ 12022.7, subd. (a)). And finally, counts 1 through 3, 7 through 13, and 15 all included various firearm enhancement allegations (§§ 12022.5, subd. (a) and 12022.53, subds. (c), (d) & (e)).

On August 22, 2019, a jury found appellant guilty on counts 10, 11, 12, 13, and 15, along with the special circumstance, enhancements, and special sentencing allegation as to those counts. The jury was unable to reach a verdict on counts 1 through 9 and a mistrial was declared as to those counts.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     Count 14 charged Robert Lee with possession of a firearm by a felon (§ 29800, subd. (a)(1)). Lee was initially charged as a codefendant, but was later dismissed from appellant's case and is not a party to this appeal.

On August 27, 2019, the trial court found the strike, serious felony, and prison prior allegations true.

Counts 1 and 3 were subsequently amended on September 4, 2019, to charges of assault with a firearm (§ 245, subd. (b)), and appellant agreed to plead no contest to five counts of assault with a firearm (counts 1 and 3 through 6). Counts 2 and 7, 8, and 9 were dismissed in the interest of justice.

On May 22, 2020, the trial court granted appellant's motion to strike his prior strike, his prior serious felony, and his prison priors. It then denied appellant probation and sentenced him to state prison for life without the possibility of parole on count 10, plus 25 years to life for the firearm enhancement; to a term of 15 years to life on count 11, plus 20 years for the firearm enhancement. Appellant's sentences for counts 12, 13, and 15 were stayed pursuant to section 654. As to count 1, the trial court sentenced appellant to the upper term of nine years, for counts 3 through 6, the term of two years, one-third the middle term, for each count, for a total of 17 years consecutive, all to run concurrent with the sentence in count 10.

On appeal, appellant contends the trial court abused its discretion (1) when it refused to dismiss the jury; (2) when it dismissed a juror; (3) when it failed to make an adequate inquiry of a particular juror; (4) when it denied appellant's motion for confidential juror information; and (5) when it denied appellant's *Marsden*[3] motion. Appellant further contends (6) that the great bodily injury enhancement and gang enhancement attached to count 13 must be stricken; (7) that appellant was incorrectly sentenced on count 11; and (8) and (9) that the abstract of judgment must be corrected. Finally, appellant argues (10) that if his murder conviction is reversed, his conduct credits must be re-evaluated; and, in supplemental briefing (11) that Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) requires reversal of the section 186.22,

---

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

subdivision (a) substantive gang offense, the section 186.22, subdivision (b)(1) gang enhancements, and the section 190.2, subdivision (a)(22) gang special circumstance finding. We agree with appellant's assertions in issues (6), (7), (8), and (11), and remand for resentencing and correction of the abstract of judgment consistent with the views expressed in this opinion. In all other respects, we affirm.

## STATEMENT OF THE FACTS

*Facts as to Counts 10, 11, 12, 13, and 15*

On July 9, 2015, appellant, a member of the Country Boy Crips criminal street gang, attended a memorial barbeque with several of Country Boy Crips, including Mister Bailey, Garrett Collins, and Robert Lee. While at the barbeque, the men learned that members of the East Side Crips, their main rival gang, were hanging out outside an apartment complex on Palmacia Drive in Bakersfield.

Bailey, driving his girlfriend's Honda, drove appellant and Collins to the area of Palmacia.[4] Both appellant and Collins were armed. Upon arrival at the apartment complex, Bailey, Collins and appellant saw a group of approximately 10 men outside the complex, including Darnell Dickerson. Collins was uncomfortable with Bailey as the driver, so withdrew from the formed plan to shoot at the men. The three returned to the area of the barbeque and reunited with Lee.

Lee replaced Collins in the vehicle and the men returned to Palmacia. Collins left his .38-caliber revolver in the vehicle when he exited. Bailey parked his vehicle down the street from the apartments and Lee approached the area, armed with a revolver. Appellant was armed with an automatic handgun.

Dickerson, a member of the East Side Crips, was drinking with Brian Anderson outside the apartments. Neither Dickerson nor Anderson were armed, and Anderson was

---

[4] Bailey was in witness protection and testified under an immunity agreement, giving him complete immunity for anything he may have done on July 9, 2015. Collins also testified pursuant to an immunity agreement.

4.

not affiliated with any gang. At about 8:30 p.m., Dickerson heard footsteps that made him uneasy and he began running.

After approaching the apartments, appellant "banged the east side" and shooting erupted. Both Lee and appellant were shooting; approximately 10 shots were fired from different guns. Dickerson was able to escape, but Anderson, who was running in front of Dickerson, tried to crawl under a gate and appellant followed him and continued to fire. Anderson was ultimately shot as he was running back toward the apartments.

When appellant returned to the vehicle, he had a gunshot wound to his hand, and explained to Bailey that Lee accidentally shot him. The men fled from the scene and eventually returned to the barbeque.

When officers arrived on the scene, they found Anderson unresponsive and taking short, shallow breaths. He had two bullet wounds to his arm and one fatal wound to his abdomen. The bullet recovered from Anderson's body was medium caliber, consistent with a .40-caliber or nine-millimeter bullet.

Six nine-millimeter different brand shell casings were recovered from the area around the apartment complex.

Blood was collected from three different sites at the crime scene. Dr. Ruth Dickover testified regarding DNA comparison and analysis of items collected from the scene of the shooting. As part of her analysis, Dr. Dickover relied on TrueAllele, a "computer program for the analysis of complex DNA mixtures, low level mixtures, [and] degraded mixtures." According to Dr. Dickover, the program "has been validated to be both accurate and reliable on numerous occasions."

Using the TrueAllele program, Dr. Dickover determined that one of the blood samples collected from the crime scene was 24 quintillion times more likely to be from appellant than from a random person in the African-American population, 3.9 sextillion times more likely than someone in the Caucasian population, and 940 sextillion times

more likely than someone in the Hispanic population. Testing as to the shell casings was inconclusive when compared to appellant's DNA.

Officer Michael Malley testified as an expert in the area of criminal street gangs and opined, based on contacts appellant had with other officers, his tattoos, and social media, that appellant was an active member of the Country Boy Crips at the time of the shooting.

The parties stipulated that appellant had previously been convicted of a felony.

*Defense*

Appellant testified in his own behalf and admitted he was a member of the Country Boy Crips on July 9, 2015, but denied he was involved in Anderson's murder. Appellant denied knowing Bailey or Anderson and claimed he had not gone with Bailey to the Palmacia apartment complex on the night of the shooting. Appellant testified that he was shot in the hand while attending the July 9, 2015, barbeque. He was hurt that Collins had implicated him, as he thought of Collins as a brother.

Appellant disputed the DNA evidence, claiming the TrueAllele software was not accurate. Appellant presented the testimony of Thomas Fedor, who questioned the reliability and accuracy of the TrueAllele program, noting that, without knowing the source code that was being used, it was not possible to verify the results. Fedor further testified that TrueAllele cannot "give the same answer twice in a row because it doesn't calculate the right exact answer," and when it is "right, it's right by coincidence." Fedor did acknowledge that he had not reviewed any of the DNA testing done in the instant case.

*Rebuttal*

Garett Sugimoto, the DNA technical lead criminalist at the Kern Regional Crime Laboratory, testified that the TrueAllele program is "helpful to interpret DNA profiles that may be either low level or may be DNA from multiple contributors." Sugimoto also

testified that TrueAllele is used to conduct probabilistic testing and that it is "accurate given the validation studies" that have been conducted.

*Facts as to counts 1, 2, 3, and 6*[5]

On April 23, 2015, police officers were dispatched to the Kern Medical Center to contact C.K., who had multiple gunshot wounds to his stomach and legs. C.K. told the officers he had been driving his vehicle when appellant, a member of a rival gang, pulled up alongside him and began shooting. Officers observed 10 bullet holes on the passenger door of C.K.'s vehicle and a bullet fragment and several shell casings were recovered.

On May 2, 2015, officers were dispatched regarding a shooting that occurred in front of an apartment complex. When the officers arrived, they observed 40 to 50 individuals walking and running in the area. The officers eventually made contact with Sabrina D., whose left arm was wrapped in a blanket soaked in blood. According to Sabrina, she and her sister had just arrived at the apartment complex when appellant and two other males drove past her and appellant began shooting at Sabrina's vehicle. One of the bullets struck Sabrina in the arm. Sabrina's sister and children were also in the vehicle at the time and sustained minor injuries. Officers observed bullet strikes to Sabrina's vehicle and found four spent shell casings in the area.

## DISCUSSION

I.  DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT REFUSED TO DISMISS THE JURY?

Appellant claims that the trial court abused its discretion in refusing to dismiss the jury and declare a mistrial following allegations of juror misconduct that involved a group of jurors discussing the testimony of the People's DNA expert before deliberations.

---

[5] As discussed *ante,* the jury was unable to reach a verdict as to counts 1 through 9 and a mistrial declared. Appellant subsequently entered a no contest plea to amended counts 1 and 3 through 6, and the parties stipulated that the offense reports contained a factual basis for the plea. These facts are therefore summarized from the probation officer's report.

Appellant argues that "the jurors who discussed [the expert] engaged in clear misconduct," which was "inherently prejudicial" and "biased the jurors in the prosecution's favor," requiring the judgment be reversed. We disagree.

*Background*

After the jury was sworn and prior to any breaks in the proceedings, the trial court instructed, in part, as follows: "[y]ou must not converse among yourselves … on any subject connected with this trial." Prior to breaks in the proceedings, the trial court repeated this admonition, stating, "[a]s you're all aware, you're not to converse among yourselves or with anyone else on any subject connected with this trial, nor to form or express any opinion thereon, until the cause is finally submitted to you by the Court."

The People's expert on the area of DNA analysis, Dr. Ruth Dickover, testified on June 17, 2019. During a break in Dickover's testimony, the jury was again admonished not to converse among themselves or with anyone else "on any subject connected with the trial .…"

On June 19, 2019, two days after Dickover's testimony, the trial court noted that Juror No. 604[6] had called the court and expressed concern regarding the content of Dickover's testimony. The trial court noted that the juror had asked "something along [the] lines" of whether there was going to be a "layman's version of the testimony" because "nobody understood it except for the chemist."

The trial court then brought Juror No. 604 into the courtroom and asked about her question concerning the jury not understanding Dickover's testimony. Juror No. 604 stated that she "could tell looking at people that, you know, most of us didn't understand it. I mean, I don't know if the chemist understood it, but he's a chemist, so – I assume he might have understood more, but we don't talk about it." Juror No. 604 subsequently

---

**6**     For simplicity purposes, we use the last three digits of the juror identification numbers.

confirmed that she had not talked about Dickover's testimony with any of the other jurors.

Following a side bar, the trial court then called in Juror No. 303, a chemist, and asked if jurors had discussed any of the evidence in the case. Juror No. 303 stated that "the most [they had] discussed is courtroom dynamics." When asked if there had been any discussion about any of the particular witnesses, Juror No. 303 said, "Not that I'm aware of." When asked specifically about Dickover, Juror No. 303 stated that he "shared that I liked her appearance" and "enjoyed" her testimony "because it was technical." Juror No. 303 stated that "most people said they were a little bothered by their testimony," but denied that any of the jurors had asked him to interpret Dickover's testimony, and he acknowledged that he understood he would not be allowed to do so.

The trial court held another side bar and then asked when the discussion regarding Dickover had occurred. Juror No. 303 explained that the conversation took place over lunch during a break in Dickover's testimony, and he believed it was Juror Nos. 604, 330, 586, and 349 who were present at the time. Juror No. 303 explained there were "comments about [Dickover's] appearance when she came in and some people were bored," but that he did not believe they "touched on anything that was evidentiary or come to conclusions that we might draw."

The trial court explained that the general admonition that it gave the jury prohibited such discussions, and Juror No. 303 confirmed that his impressions of Dickover would not impact his decisionmaking and it would not be a problem moving forward.

Following another side bar, the trial court questioned Juror No. 330, who recalled being at the lunch in which Dickover was discussed. Juror No. 330 stated that he felt as though the testimony was "in code" and that the jury "needed … something to decipher the code she was speaking in," but that he "actually understood" it. Juror No. 330 confirmed that the group did not try to explain or decipher the testimony during the

9.

conversation.  Juror No. 330 was admonished not to discuss witnesses until deliberation, and he confirmed that he understood the trial court's instructions.

Juror No. 349 was called into the courtroom and acknowledged she had also been involved in the conversation about Dickover, but only recalled general comments about Dickover being "super smart" and giving detailed answers to the questions she was asked.  Juror No. 349 thought that she had only opined during that conversation that she thought Dickover's credentials were "impressive."  Juror No. 349 thought the basic conversation was about "how easy it was" to understand Dickover, even though it was "not an easy topic to understand the DNA process .…"  Juror No. 349 thought that, in addition to Juror Nos. 604, 330, and 586, the conversation might also have included Juror No. 303, but she was not sure, and Juror Nos. 617 and 833.  Juror No. 349 was again admonished not to converse with anyone about the trial, and Juror No. 349 stated she understood.

The trial court then questioned Juror No. 586, who stated he recalled the conversation regarding Dickerson only being "about generalities, kind of difficult to follow a bunch of numbers."  Juror No. 586 assured the trial court that nothing about the conversation would impact his ability to go forward as a fair juror.

The trial court then questioned Juror No. 617, who stated that the jurors "made reference to [Dickover's] last name," which was "interesting," and he believed others had said she was "hard to follow," but that he did not contribute to the conversation.  Juror No. 617 agreed to follow the trial court's admonition going forward.

Juror No. 833 recalled a discussion regarding the volume of information Dickover presented, but that she took notes and understood it.

Following these inquiries, defense counsel made " a poison panel motion and a motion to dismiss the case or at least … this jury," arguing the DNA evidence was "the most important part of the case" and that it had already "been weighed and judged."

Counsel argued further that Juror No. 303, the chemist, had "prestige with the jury" and had "expressed his satisfaction of the evidence."

The People opposed the motion, arguing that there was "general conversation" regarding Dickover's testimony, but that jurors had "never talked about specifics," and "[n]one of [the conversation] went to the merits of the case or the weight of the evidence." The People disagreed that Juror No. 303 had "approved" or "agreed with the testimony."

The trial court ultimately denied defense counsel's motion to dismiss the jury. In doing so it acknowledged that the jury had violated the admonition, but that it had not been done purposefully. The trial court described the "general discussion" as being about Dickerson's "name or appearance that related to the idea that … she was very difficult to understand, because of the technical nature of what she was testifying to." The trial court recounted the nature of the conversation, juror by juror, and ultimately determined that nothing that had been reported by the jurors would prevent the parties from receiving a fair trial.

Defense counsel asked whether the trial court would consider removing Juror No. 303, as he had "given his seal of approval" to Dickover. The trial court denied the request, stating that it did not agree that was the case, but that Juror No. 303 "simply said — the discussion was that nature of understanding and whether it was boring, this type of testimony, his statements [were] simply that it didn't bore him. He liked this kind of testimony. It didn't mean he was approving it and he agreed with everything Ms. Dickover said or accepted everything that she said as a fact and I … do believe these other jurors are capable of thinking for themselves and that very may well be his position when he gets back in the jury deliberation room and that may be what he argues extensively to the other jurors, but each juror has a duty to decide this case for themselves. [¶] I have no reason to believe that they are going to decide it based on what [Juror No. 303] said based on anything I have heard here"

11.

The jury was brought back into the courtroom and the trial court addressed them, in relevant part, as follows:

> "I'm going to read the admonition and just talk to you about it … a little more specifically. It's your duty not to converse among yourselves or with anyone else on any subject connected with this trial, nor to form or express any opinion thereon, until the cause is finally submitted to you by the Court. [¶] And that's the shorter version of the admonition. The longer version I read to you only once. But, essentially, it's somewhat general, but it's important that everybody understand … what that entails, … in terms of talking about any subject connected to the trial, that would include talking about the witnesses, okay? [¶] … [C]ertainly, you're going to have impressions about witnesses and there's no issue .… [T]his is one of the most important jobs that you're going to have in your life and so your concentration and your focus we hope is on this case and what's being presented to you … and it's understandable how, you know, when you're having lunch with somebody or just talking to one of the other jurors, that's what you've been listening to now … that you want to make some comment about it, but even commenting about a witness or, you know, what a witness look[ed] like or didn't look like and … whether you understood or didn't understand a witness, that's still talking about the case, does everybody understand that? [¶] So you can't even have discussions about anything even on that level, that would be a violation of the admonition .…"

*Standard of Review and Applicable Law*

A criminal defendant is constitutionally entitled to an unbiased, impartial jury. (*People v. Weatherton* (2014) 59 Cal.4th 589, 598.) "Jurors must be admonished not to 'form or express any opinion about the case until the cause is finally submitted to them.' (§ 1122, subd. (b)). Prejudgment 'constitute[s] serious misconduct' [citation], raising a presumption of prejudice. The presumption is rebutted 'if the entire record ... indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " (*Ibid.*; see *People v. Fayed* (2020) 9 Cal.5th 147, 174.) We review independently the mixed question of law and fact whether jury misconduct was prejudicial. (*People v. Weatherton, supra,* at p. 598.)

12.

"Jury misconduct serious and extensive enough to impair the fairness of the trial or deliberations may warrant granting a new trial motion. [Citations.] Where the trial court has heard evidence and made findings of historical fact regarding the alleged misconduct, we accept those findings if they are supported by substantial evidence." (*People v. Flinner* (2020) 10 Cal.5th 686, 755-756.) We do not reweigh the trial court's credibility determinations when supported by substantial evidence. (*People v. Merriman* (2014) 60 Cal.4th 1, 100.) A trial judge who observes and speaks with a juror gathers from the juror's confidence and demeanor valuable information that does not appear in the appellate record. (*Id.* at p. 101.)

We agree with the trial court that the jurors committed misconduct when they had a short-lived general discussion about the People's DNA expert Dickover during lunch prior to deliberations. We also agree with the trial court that, while the jurors may have unwittingly committed misconduct, it was not prejudicial. The jurors were each questioned by the trial court and indicated that the conversation mostly involved general observations about Dickover's appearance, her unique name, and the technical and complex nature of her testimony.

Nothing in the record suggests that any of the jurors involved in the lunchtime conversation drew any adverse inference against appellant or prejudged the case. None of the jurors who were questioned indicated that the conversation would have any impact on their ability to be fair and impartial.

Appellant contends Juror No. 303, who was a chemist, made comments implying that Dickover's testimony was credible. The evidence, however, was that Juror No. 303 commented that he enjoyed the technical nature of the testimony and expressly stated that he did not believe the conversation "touched on anything that was evidentiary or c[a]me to [any] conclusions." We do not second-guess the trial court's conclusion that Juror No. 303's explanation was credible.

13.

Following the extensive inquiry of the involved jurors, the trial court took extra precaution and further admonished the jury, instructing them again not to discuss the case, even if the discussion was limited to a witness's appearance.

Because the jurors' inability to serve impartially did not appear as a demonstrable reality in the record, we agree with the trial court's finding that the presumption of prejudice was rebutted. The trial court's failure to dismiss the jury or jurors involved was therefore not an abuse of discretion.

For the same reasons, we reject the included claim by appellant that the trial court abused its discretion in denying his motion for a new trial based on jury misconduct (§ 1181, subd. (3)). (See *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears' "], abrogated on other grounds as noted in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see also *People v. Dykes* (2009) 46 Cal.4th 731, 809 [regarding motion for new trial based on jury misconduct "reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial"].)

II.  DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT DISCHARGED A JUROR?

Appellant next contends that the trial court erred in removing Juror No. 604 from the jury during deliberations. Appellant argues that the record does not support the trial court's finding that Juror No. 604 failed to deliberate. Appellant contends further that the trial court failed to adequately question whether the experiences Juror No. 604 was expressing were ones prohibited by law and that it failed to question Juror No. 604 on her

14.

allegations that "jokes or comments of a racial nature had been made by other jurors."[7] We first address the issue of whether the trial court abused its discretion in dismissing Juror No. 604 because she refused to deliberate and find no error.

*Background*

Following closing arguments, the jury retired to deliberate on July 26, 2019, close to 5:00 pm. Minutes later, the jurors were ordered to return on August 5, 2019, at 10:00 a.m.

On August 5, 2019, at 10:27 a.m., the jury asked the trial court for a list of counts and associated dates. The trial court responded that the information the jury was seeking was contained in the verdict forms. Between then and the end of the day, the jury broke for lunch and submitted two additional notes to the trial court — one requesting additional evidence regarding a video that had been played at trial and one requesting a read back of testimony and additional copies of the verdict forms for review.

The following day, August 6, 2019, the jury returned to deliberate at 9:43 a.m. Toward the end of the day, it sent another note requesting additional read backs of testimony. Deliberations ended for the day shortly thereafter and the jury was ordered to return the following morning.

On August 7, 2019, prior to the start of the third full day of deliberations, the trial court received a typed letter from Juror No. 604. In the note, Juror No. 604 expressed concern regarding a long delay to accommodate one of the sitting jurors, as well as "certain men" on the jury who Juror No. 604 thought were belittling and mocking her "in an attempt to sway her vote." Juror No. 604 also expressed concern that some jurors were bringing outside information into the deliberations.

The trial court then addressed the jury, noting that it needed to deliberate and listen "to what everybody has to say," and evidence should be limited to that which was

---

[7] Juror 604 was the one female African-American on the jury.

presented in court. All of the jurors stated that they understood the court's instructions and the jury exited the courtroom to continue deliberating.

Shortly thereafter, the bailiff noted he "could hear yelling coming from the jury room" and there was "bolder language" and "yelling back and forth between a couple of jurors," requiring the jury to exit the jury room and take a break. When the jury returned to the courtroom, the trial court stated that it understood emotions were high, but that all jurors were required to discuss the case in a rational manner. The trial court asked Juror No. 439 (foreperson), if the jury needed a break or if it would be better to proceed with the read back that had been requested. The foreperson responded that she was "not convinced either would work," but believed they should proceed with the read back. When asked, the jurors indicated they were all concerned with what was occurring in the deliberations.

The trial court repeated that the jurors were required to have open discussions, to listen to "what everybody has to say," and have a "meaningful discussion about the evidence without … being confrontational with other jurors."

Juror No. 604, who had sent the above mentioned letter to the court, stated "none of the things you're talking about seem to be the topics of concern," explaining that there were issues around race. The trial court stated that it was not getting into specifics yet, but would address such specifics if a note to that effect was sent. The trial court stated that the jury was required to reach a decision without any bias, and the jury was returned to the jury room for read back and to continue deliberations.

After the jurors exited the courtroom, the parties were asked if they had any comments on what had transpired. Defense counsel stated that he did not believe there was "any chance" that the jury could deliberate properly and moved for a mistrial. The People argued that the motion was "highly premature" and the trial court agreed, stating that the jury had not said it was unable to reach a verdict, and that request for read back indicated that they were still deliberating. Defense counsel renewed his motion for

mistrial, stating no effort had been made to find out who "the intimidators are." The trial court denied the motion, again stating that, while what had transpired had been "certainly unusual," there was no reason to believe the jurors could not fulfill their duties, and it appeared that they were continuing to deliberate.

The jury sent three additional questions to the court during the day. Prior to ending deliberations that evening, the jurors were returned to the courtroom to discuss scheduling. One juror remarked that they were pretty confident "we can finish this in two days."

When the jury reconvened the following Monday, August 12, 2019, during the morning, it sent two notes to the court requesting evidence. Mid-afternoon, the jury submitted a third request, which was signed by the foreperson and asked:

> "If the rest of the jurors agree, can the jurors make a proposal to dismiss one of the jurors? [¶] There is a widely held belief that this individual is incapable of meaningfully contributing to a rational discussion of the matters of this case. A preponderance of evidence can be provided and a vote can be made if necessary (if the court is capable of entertaining this request)."

Juror No. 604 added a line at the bottom of the note which stated, "I disagree since they are referring to me." Before the trial court had an opportunity to respond, the jury requested another read back of testimony.

Before the end of the day, the trial court began by discussing the request to remove a juror with the foreperson. The trial court noted that the jury had been deliberating for three days prior to the "blowup." The foreperson responded that 11 people had been deliberating, but Juror No. 604 was "very defensive" and had taken the stance that she "doesn't want to participate." The foreperson explained that Juror No. 604 had not participated in any voting on the charges on at least five occasions, and quit engaging in the discussions the jurors had. While the foreperson had tried different ways of approaching Juror No. 604 and attempting to get her involved in the voting process and

17.

discussions related to voting, nothing had worked. The foreperson stated that she did not believe Juror No. 604 was "able to have the kind of conversations that a reasonable person would be able to have."

The trial court then spoke with Juror No. 788, who stated that "[m]ost of the time" the jurors were deliberating but there had been situations where Juror No. 604 refused to be a part of it. Juror No. 788 described Juror No. 604 as, at times appearing to have "[c]hecked out" and not wanting to be part of the discussion. Juror No. 788 stated that Juror No. 604 had participated in the voting process before the note was sent about having her removed, but not after. Juror No. 788 did, however, agree that it would be difficult to move forward with Juror No. 604 on the jury because she was so easily upset.

The trial court then spoke to Juror No. 207, who explained that he disagreed with the note and he believed Juror No. 604 was contributing to the deliberations. He did describe Juror No. 604 as kind of dogmatic, very deliberate in not wanting anybody to sway her decision, and, once presented with a different view, tried to poke a hole in that theory. According to Juror No. 207, Juror No. 604 had participated in the votes until the note about her removal had been sent.

The trial court then spoke with Juror No. 604, who stated she "would just like follow the rules and stick to the evidence," but that there was "a lot of information being presented that wasn't presented during the trial." Juror No. 604 also expressed concern regarding "jokes [that were] made about how black people talk in the hood and how gangsters talk," which she did not feel was appropriate. Juror No. 604 did not believe there was anything preventing the jury from moving forward with deliberations, although she acknowledged that she stopped participating after the other jurors asked if she could be removed. She denied she had abstained from any votes prior to the note, but did not feel like she should "have to be in a room six hours a day with people who are making jokes about black people."

The jurors were dismissed for the evening, and the following morning, August 13, 2019, defense counsel argued that the comments from jurors were "not anywhere near enough to be removing jurors … who are not making somebody on the jury happy." The trial court noted defense counsel's argument, but asserted it was still in the process of investigating the actual issues that lead to the request to have Juror No. 604 removed.

Juror No. 303 was then questioned by the trial court. He acknowledged that he had written the note, and he explained that there had been "conflict" from day one and "people were throwing up their hands and giving up." Juror No. 303 stated that "a lot of it had to do with the type of conversation[s] that were being had with [Juror No. 604]." While the jury had "tried a lot of different approaches" to deliberating, they were not making progress and began to look at the evidence "point by … point" and take "votes of … confidence" as to each piece of evidence. According to Juror No. 303, Juror No. 604 expressed a lack of confidence regarding evidence to which the parties had stipulated, and that conversations with Juror No. 604 often stalled without resolution. Juror No. 303 explained that, while Juror No. 604 was "[s]omewhat" involved in the discussions, she did not want to participate in the jury's decision to go through the evidence point by point.

Juror No. 303 explained the altercations that had been observed by the bailiff earlier and explained that Juror Nos. 330 and 617 had gotten "very frustrated" with Juror No. 604, as she would discuss her views on the evidence, but would disregard other jurors' views and would accuse people of attacking her. Juror No. 303 confirmed that Juror No. 604 had stopped voting and participating in the deliberations after the note was sent.

When the trial court asked Juror No. 303 if race had been interjected into the deliberations, he stated:

> "[Juror No. 604] brought up race. She's the only one explicitly brought up race and this goes to another issue that — without line of argument, she

19.

> will kind of introduce her experience on — as to evidence, she will say, like, well, I do this this way and this person is similar to me. Therefore, it's unreasonable for them to do other than anything I would do in that situation."

Juror No. 303 stated that there had been no jokes relating to race. When asked if something had been said about race to which someone took offense, Juror No. 303 stated that there were a few things that were "real borderline like insinuating like maybe certain people that are voting certain ways based on race and it kind of left a bad taste in my mouth .… I wanted to make sure I wasn't insinuating, so I purposefully brought that up yesterday." Juror No. 303 wanted to get it out in the open, and he thought that resolved the issue amicably and, overall, it was not an issue.

Juror No. 833 agreed there was an issue with Juror No. 604's conduct during deliberations. On a couple of occasions, she brought in some of her own personal experiences and at other times told other jurors she was "not going to listen " to them. Juror No. 833 believed Juror No. 604 was resistant to hearing other opinions or giving her own, and would not even give an opinion when asked for one.

Juror No. 458 explained that there was an issue with Juror No. 604, as she had not been able to follow instructions and that no matter what the other jurors suggested, Juror No. 604 "wants to argue about it or just not agree to participate in the process." When asked if race had become an issue, Juror No. 458 stated that, it did not start that way, but there was a discussion about how Juror No. 207 (the only male African-American juror) would sometimes agree with Juror No. 604, and Juror No. 207 said that had nothing to do with anything. Juror No. 604 then got up and yelled at people and asked if this was because they were black. The bailiff then had to intervene. When deliberations resumed, Juror No. 617 directed a discussion at Juror No. 207, stating all Juror No. 207 did was back up Juror No. 604, and Juror No. 604 started yelling again and again the bailiff intervened.

20.

Juror No. 823 explained that Juror No. 604 "keeps bringing up past experiences" and is not "part of the open discussion." On one day, Juror No. 604 "just put her sunglasses [on] and sloped down and didn't talk the whole time," refusing to participate in deliberations and preliminary votes. According to Juror No. 823, Juror No. 604 seemed to be "dismissing all the evidence" and that she was "not listening." When confronted about her opinions, Juror No. 604 would state that the other jurors were ganging up on her and were "being racist."

Juror No. 349 described Juror No. 604 as not willing to "take in other's opinions" or "hear other people out," and that she would get defensive and shut down without trying to explain her reasoning. Although Juror No. 604 sometimes participated in discussion, she at times stood away from the group or put her head down when others were speaking. Juror No. 349 also noted that Juror No. 604 was not cooperative in trying different approaches to deliberating, explaining that when the other jurors decided to go through the evidence to pinpoint areas that required further discussion, Juror No. 604 refused to vote on anything or discuss the issues further.

Juror No. 330 stated that Juror No. 604 was not deliberating "whatsoever," and would cross her arms and throw back her head and refuse to comment when asked her opinion. While the jurors made several attempts to change the process of deliberating, Juror No. 604 continued to refuse to participate, at times putting on her headphones and sunglasses and tuning the other jurors out. While Juror No. 330 described the other jurors as not all agreeing with what the others were saying, "everybody is listening and talking it through," except for Juror No. 604, who was "not involved whatsoever."

Juror No. 243 stated that Juror No. 604 was "being very unreasonable about everything," including the structure of the deliberations and scheduling. When asked if Juror No. 604 had been involved in discussions regarding the evidence, Juror No. 243 said, "Yes and no," stating Juror No. 604's thought process seemed unreasonable and she was not following instructions that were given. Juror No. 243 stated that, while other

21.

jurors did not all agree with one another, Juror No. 604 was not being reasonable and would "argue if it's day or not." Juror No. 243 had also observed Juror No. 604 wearing sunglasses and headphones during deliberations.

Juror No. 617 explained that Juror No. 604 was not acting rationally, would wear her sunglasses and headphones and sleep while the other jurors were deliberating. Juror No. 617 described Juror No. 604 as disengaged from everybody else and had resisted the other jurors' attempts to deliberate in different ways. Juror No. 617 said Juror No. 604 did not seem to be listening to other jurors' views and when she shared her opinions, they did not seem to make sense and were not relevant to the case.

After talking with all 12 jurors, the trial court stated it wished to question Juror No. 207, the foreperson, and Juror No. 604. It first spoke to Juror No. 207 about the "blowup" incident that had occurred, which Juror No. 207 acknowledged involved yelling between himself and Juror No. 617, after Juror No. 207 had said they should allow Juror No. 604 to "get her point out," but that it was only between himself and Juror No. 617 and there were no other issues between them.

The trial court asked Juror No. 207 if race had become an issue and if there were any jokes about race. Juror No. 207 replied:

> "I don't even know if it was a joke. I just attributed [it] to age and silliness, but a comment was made that I can relate to what you guys are going through, meaning me and [Juror No. 604], because people have called me the N word or called me a sand N word. And so my thing was, like, what the hell does that have to do with this? [¶] So it didn't go anywhere, because, you know, I just thought it was silly, but I understood, I guess, what he was trying to say. I guess he was trying to relate to the argument. I don't think it was – I don't think it was malice."

Juror No. 207 explained that another juror (not Juror No. 604) thought it was with intent and a day or two later, Juror No. 303 said how he felt about the situation, and he thought that something had been interjected into the deliberations that had to be resolved. Juror

22.

No. 617 then said he just thought Juror No. 207 defended Juror No. 604, but Juror No. 617 said he did not mean it from a racial standpoint.

Juror No. 207 denied that there had been any issues with Juror No. 604 expressing her opinion, and that, prior to the note, she had "probably talked more than anybody." Juror No. 207 also denied that Juror No. 604 had ever refused to participate and he had only seen Juror No. 604 wearing headphones and sunglasses when the jurors agreed to read independently.

The trial court then spoke with the foreperson, again who clarified that Juror No. 604 had refused to take part in the jurors' vote regarding major pieces of evidence. The foreperson could not recall if Juror No. 604 had refused to take part in the votes regarding the counts, but she had refused to vote for foreperson or participate in votes regarding scheduling. While Juror No. 604 would at times give her views on evidence, she would get upset when asked questions about her opinions. The foreperson had seen Juror No. 604 with her headphones on during silent reading and on the day of the "blowup" had worn her sunglasses.

The foreperson described the "blowup" as having occurred because Juror No. 617 felt Juror No. 207 was being unreasonably protective of Juror No. 604, and when Juror No. 617 made a comment, he and Juror No. 207 exchanged words. Juror No. 604 then got in Juror No. 617's face and stood over him and yelled at him.

The trial court then spoke with Juror No. 604 again. She acknowledged that she had been involved in a disagreement with Juror No. 617, but she denied any use of profanity. She explained that she believed Juror No. 617 was trying to manipulate the others by attributing things to her she had not said, noting she was "really upset" and had "put up with this for weeks and weeks." Juror No. 604 initially denied she had ever put her headphones on in the jury room, but later acknowledged that she may have had them in her ears to block outside noise when she was reading. She acknowledged she may have worn her sunglasses "because of the fluorescent lights." Juror No. 604 claimed she

23.

had participated in discussions "unless [she] didn't have an opinion" on the evidence, and, at times, wanted to review her notes before giving an opinion. Juror No. 604 claimed that other jurors made jokes about race on a regular basis. Juror No. 604 asked the trial court if there was anything that could be done to prevent jurors from bringing in outside information, noting other jurors had discussed "how far … [¶] … bullet fragments can fly."

After speaking with all of the jurors, the trial court noted the "overriding issue" was whether or not there had been juror misconduct "that would necessitate this court perhaps discharging … one of the jurors, in particular [Juror No. 604]." Stating good cause was needed to excuse a juror, the trial court then allowed the parties to argue.

The People argued that Juror No. 604 should be removed, pursuant to section 1089, as she had a "negative animus towards her fellow jurors" and would "tune them out and stop participating with them whenever she feels such .…" The People stated that another prosecutor, not connected to the case, had heard Juror No. 604 state that she "wasn't going to listen to anything [the other jurors] had to say" in relation to a scheduling conflict. The People argued this reported sentiment seemed to support the information received from other jurors that Juror No. 604 did not and would not deliberate. The People pointed out that Juror No. 604 did not listen and would not follow the trial court's instructions on things as simple as stipulations, she was hostile and did not seek to resolve differences. The People noted that, while Juror No. 207 had tried to protect Juror No. 604, even he had indicated that Juror No. 604 was "quite bullheaded" and was not willing to listen to other jurors' opinions.

The People argued that even Juror No. 604 herself had indicated she had a "persecution complex" that included reference to racial jokes and biases no one else on the jury had mentioned. The People opined that this complex led Juror No. 604 to put up a wall and left her unable to listen to others or deliberate, as evidenced by Juror No. 604's acknowledgment that she did not share her opinions with the other jurors when they were

reviewing evidence. Furthermore, the People argued Juror No. 604 was not following jury instructions, she was bringing her own personal experiences into the deliberations, and she failed to treat other jurors with respect and dignity, all pointing to good cause to remove Juror No. 604 from the jury.

Defense counsel disagreed, first arguing that Juror No. 604's statement regarding her refusal to discuss a scheduling issue should not be used in evaluating whether or not she should be removed from the jury. Defense counsel discussed the testimony of the other jurors, stating it was inconsistent. Defense counsel also stated that it was early in deliberations for there to be any voting as to the ultimate facts and that Juror No. 604 had been involved in deliberations until the note regarding her removal was sent to the court.

The People again disagreed, noting that the read backs had been necessary because Juror No. 604 had refused to reexamine her position on the facts. The People again asserted that Juror No. 604 was not deliberating, a position supported by every juror except Juror No. 207.

The trial court then discussed its discretion under section 1089 to discharge a juror in certain situations, including when there is good cause shown that the juror is unable to perform his or her duty. The trial court stated that it had reviewing case law regarding the guidelines as to what would constitute a refusal to deliberate. While the court stated that it could not "talk about everything everybody said," it did note that the foreperson, as well as other jurors, felt that Juror No. 604 was not deliberating and, at times, not voting. It also noted other jurors description of Juror No. 604 shutting down, not responding to questions, and not being involved in the discussions.

The trial court also noted several jurors reporting that Juror No. 604 wearing headphones and sunglasses, and, while Juror No. 604 ultimately acknowledged having done so, she had initially denied it. While Juror No. 604 had been given the opportunity to tell others how she wanted to proceed, she had refused to do so; she was not open to

25.

listening to or reasoning with opposing views, and she would interject her own personal experiences into the evidence for purposes of discussion.

The trial court acknowledged that Juror No. 207 was supportive of Juror No. 604, but "there were some issues."  And that Juror No. 604 "paint[ed] a different picture of herself" as to how she was handling the process.  The trial court stated that this was "not simply an issue of [the jurors] disagreeing as to what the facts or the evidence is, but it [went] to the root of the idea of what deliberations are and that's a willingness to discuss the case, discuss everyone's views, [and] explain your views."

The trial court explained that the jury had not been deliberating long and that the other jurors were attempting to work through the issues and accommodate Juror No. 604, but that, after talking to all of the jurors and reviewing the evidence, it appeared that Juror No. 604 was refusing to deliberate and that she was bringing her own personal experiences into the case.  The trial court also believed that Juror No. 604 was dishonest in her responses to the court.

The trial court ultimately removed Juror No. 604 from the jury.  For the record, the trial court noted that Juror No. 604 and Juror No. 207 were the only African-Americans on the jury.

*Applicable Law*

"[S]ection 1089 sets forth the procedure for removing a sitting juror."  (*People v. Boyette* (2002) 29 Cal.4th 381, 462.)  It provides, in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged ...."  (§ 1089.)  "Good cause exists to discharge a juror when the juror loses his or her ability to render a fair and impartial verdict based on the evidence presented at trial."  (*People v. Barton* (2020) 56 Cal.App.5th 496, 508

26.

(*Barton*).)  Section 1089 has also been applied "to permit the removal of a juror who refuses to deliberate, on the theory that such a juror is 'unable to perform his duty.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 475 (*Cleveland*).)  " 'A juror's inability to perform his or her functions ... must appear in the record as a "demonstrable reality" and bias may not be presumed.' " (*People v. Beeler* (1995) 9 Cal.4th 953, 975, abrogated on grounds as stated in *People v. Edwards* (2013) 57 Cal.4th 658, 705.)

"Removing a juror is, of course, a serious matter....  While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted (*Barnwell*).)  "A court's intervention may upset the delicate balance of deliberations.  The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence.  This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case.  The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.)  "[A] trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*Id.* at p. 75.)  "The court cannot substitute the opinions of jurors for its own findings of fact." (*Ibid.*)

This court's "review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*People v. Fuiava* (2012) 53 Cal.4th 622, 711 (*Fuiava*).)  " '[T]he demonstrable reality test entails a more comprehensive and less deferential review.  It requires a showing that the court as a trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror] was established.' " (*Id.* at p. 712.)

Under the demonstrable reality standard, the reviewing court "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court

actually relied." (*Barnwell, supra,* 41 Cal.4th at p. 1053.)  In reaching that conclusion, this court considers "not just the evidence itself, but also the record of reasons the court provides." (*Ibid.*)  The "heightened" and "more stringent" demonstrable reality standard "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id.* at p. 1052.)  Indeed, the trial court's discretion to discharge a juror for cause under section 1089 "is 'bridled to the extent' [that] the juror's inability to perform his or her functions must appear in the record as a 'demonstrable reality,' and 'court[s] must not presume the worst' of a juror." (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729.)

"[H]owever, even under the demonstrable reality standard the reviewing court does not reweigh the persuasive value of the evidence." (*Fuiava, supra,* 53 Cal.4th at p. 714.)  Accordingly, reviewing courts must defer to the trial court's assessments of a juror's credibility "based 'on firsthand observations unavailable to us on appeal.' " (*People v. Powell* (2018) 6 Cal.5th 136, 156; *Barnwell*, *supra,* 41 Cal.4th at p. 1053.)

*Analysis on Juror No. 604's Refusal to Deliberate*

The trial court discharged Juror No. 604 because it found she refused to deliberate. "In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*Barnwell, supra,* 41 Cal.4th at p. 1053.)  We conclude the record here supports the court's decision under this heightened standard of review.

As noted above, trial court may properly dismiss a juror based on the juror's "unwillingness to engage in the deliberative process." (*Cleveland, supra,* 25 Cal.4th at p. 485; see also *People v. Lomax* (2010) 49 Cal.4th 530, 589 ["A refusal to deliberate is misconduct."].)  "Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself

physically from the remainder of the jury." (*Cleveland,* at p. 485.)  On the other hand, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Ibid.*)  A deliberating juror's refusal to follow the law set forth in the instructions does constitute a failure to perform the juror's duties, and is grounds for discharge.  (*People v. Engelman* (2002) 28 Cal.4th 436, 444.)

"If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory." (*Fuiava, supra,* 53 Cal.4th at p. 710.)  "In most instances, the court will interview all of the jurors before deciding whether a juror is unable or unwilling to deliberate.  At a minimum, it must interview more than the complaining jurors." (*Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 553.)  " 'The inquiry [into possible discharge of a juror] should focus upon the *conduct* of the jurors, rather than upon the content of the deliberations.' " (*Barnwell, supra,* 41 Cal.4th at p. 1054, italics added.)

Appellant relies on *Barton, supra,* 56 Cal.App.5th 496, to bolster his argument that Juror No. 604 was wrongfully discharged.  In *Barton,* the Court of Appeal reversed a trial court's decision to discharge a juror, Juror No. 12, for refusing to deliberate, finding that the failure to deliberate did not appear as a demonstrable reality on the record.  (*Id.* at p. 502.)  The appellate court faulted the trial court for giving undue weight to the jurors' opinions that Juror No. 12 had failed to deliberate, as opposed to focusing on Juror No. 12's actual conduct.  (*Id.* at p. 512.)  The Court of Appeal also interpreted the record to reveal that the jurors merely disagreed with Juror No. 12's ultimate opinion regarding the evidence, and that the discharged juror had participated in deliberations for a reasonable

29.

time and merely came to a conclusion early, which she was in her right not to change. (*Id.* at pp. 512-515.)

We find *Barton* distinguishable. Unlike Juror No. 12 in *Barton,* the record here does not establish that Juror No. 604 was not deliberating because she had come to an early conclusion of the evidence or disagreed with the outcome. As noted by Juror No. 330, while deliberating, the jurors did "not all agree with what others are saying at certain points, but for the most part, everybody is listening and talking it through," except for Juror No. 604, who was "not involved whatsoever." According to Juror No. 330, "every attempt" had been made to include Juror No. 604 in the deliberations, including asking her how she would like the deliberation process to be handled, but "she refuse[d]," at times putting on her headphones and sunglasses, laying back in her chair, and "tun[ing] us completely out."

We find *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640 instructive. There, the foreperson sent a note to the court indicating Juror No. 5 was not participating in the discussion and was " 'sit[ting] away from the table and read[ing] her [B]ible instead of contributing to the group conversation.' " (*Id.* at p. 1686.) In response to the note, the court reread to the jury the instruction stating that all jurors should participate in all deliberations. (*Ibid.*) After receiving another complaint from the foreperson, the court interviewed Juror No. 5 in chambers. Juror No. 5 denied she had been reading her Bible during deliberations and also denied she sat away from the table, failed to listen, or slept during deliberations. (*Ibid.*) After receiving another complaint, the trial court questioned each juror individually in chambers. Other jurors reported Juror No. 5 became angry after she was not elected the foreperson. (*Id.* at p. 1687.) Afterwards, Juror No. 5 would turn her chair around and sit with her back to the other jurors on both days of deliberations. (*Ibid.*) Aside from reading, she also appeared to be sleeping much of the time or sat with her eyes closed. (*Ibid.*)

30.

From these interviews, the court determined Juror No. 5 "separated herself physically from the other jurors, did not pay attention to their deliberations and, instead, slept or read a novel, the Bible, or both, throughout the two days ... she was a member of the deliberating jury." (*Id.* at p. 1688.) Based on these findings, the Court of Appeal determined the trial court conducted an adequate inquiry before discharging the juror. (*Ibid.*)

Here, the foreperson described the deliberations that had occurred as deliberations "[w]ith 11 people," and that the jury "won't be able to come to any kind of decision with [Juror No. 604]." The foreperson described Juror No. 604 as "very defensive and unprovoked." While Juror No. 604 would express her beliefs, which the foreperson described as not "rational," she then refused to participate in the voting process. The foreperson described Juror No. 604 as refusing to vote on more than five occasions. Juror No. 458 stated that, no matter what the other jurors suggested, Juror No. 604 "want[ed] to argue about it or just not agree to participate in the process."

While Juror No. 604's opinions need not be in line with the other jurors in order to appropriately deliberate, her refusal to participate in the voting process, as well as her behavior in putting on her headphones and sunglasses and becoming unresponsive suggest an inability to deliberate. (*Cleveland, supra,* 25 Cal.4th at p. 485.) Also troubling is Juror No. 604's expressed lack of confidence regarding evidence to which the parties had stipulated, as the jury had been instructed to accept facts stipulated to as true or proven, and "there's no disagreement as to those facts." (*People v. Engelman, supra,* 28 Cal.4th at p. 444.)

Finally, although Juror No. 604 denied she had ever refused to participate, the trial court made a credibility finding in that regard, explaining that it believed Juror No. 604 was dishonest in her responses to the court, as "only when confronted with certain things directly was she willing to admit certain things happen[ed]." As a reviewing court, we defer to the trial court's assessments of a juror's credibility "based 'on firsthand

31.

observations unavailable to us on appeal.' " (*People v. Powell, supra,* 6 Cal.5th at p. 156; *Barnwell*, *supra,* 41 Cal.4th at p. 1053.)

Given this evidence, the record establishes a demonstrable reality that Juror No. 604 was refusing to participate in deliberations or follow the trial court's instructions, and we reject appellant's claim to the contrary.

III. DID THE TRIAL COURT FAIL TO MAKE AN ADEQUATE INQUIRY OF THE PERSONAL EXPERIENCES JUROR No. 604 WAS RELYING UPON AND OF HER CLAIMS OF RACIAL ISSUES?

In connection with part II., above, appellant also contends that the trial court did not conduct an adequate inquiry regarding the personal experiences Juror No. 604 was relying upon or her claim of racial issues among the jury. Again, we find no abuse of discretion on the part of the trial court.

"[N]ot every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court.' " (*Cleveland, supra,* 25 Cal.4th at p. 478.) "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*Id.*, at p. 485; see also *People v. Nelson* (2016) 1 Cal.5th 513, 569 ["[A] trial court may intervene in jury deliberations where it receives reports of juror misconduct or in response to an impasse, but such interventions must be limited and undertaken with the utmost respect for the sanctity of the deliberative process"].)

When the trial court discharged Juror No. 604, it noted that other jurors had tried to accommodate Juror No. 604, but that it appeared Juror No. 604 was refusing to deliberate and that she was improperly bringing her own personal experiences into the

case. Appellant contends that the trial court did not adequately inquire regarding the nature of the personal experiences Juror No. 604 was relying upon, claiming that the trial court "blindly accepted" the claim of other jurors that Juror No. 604 was interjecting her personal experiences into the deliberations without asking what experiences she was interjecting.

It is true that "[j]urors' views of the evidence … are necessarily informed by their life experiences" (*In re Malone* (1996) 12 Cal.4th 935, 963), and that a juror's application of his or her everyday life experience to the evaluation of evidence is not misconduct (*People v. Allen and Johnson, supra,* 53 Cal.4th at pp. 76-77). But here, as discussed above, the record supports the trial court's decision to discharge Juror No. 604. The trial court's inquiry was centered around the allegations that Juror No. 604 was refusing to participate in deliberations. While several jurors commented that Juror No. 604 would refer to her own personal experiences, those comments were made in reference to her refusal to deliberate and/or discuss the evidence that had been presented in the case.

Appellant also claims that the trial court did not adequately inquire regarding Juror No. 604's allegation that racial issues had come up during deliberations, claiming this inadequate inquiry "resulted in the real possibility that the verdicts in this case were rendered by a jury that include one or more jurors who should have been discharged for racial bias .…"[8] In response to an admonition by the trial court concerning the "blowup" that occurred and that the jury should not be using profanity, Juror No. 604 expressed that the issue was what "people think of other people's races." Later, when questioning each juror individually, the trial court then questioned Juror No. 604 about the issue of race. She claimed jokes about race were made "regularly." Juror No. 604's allegations, however, were not confirmed by any other juror.

---

**8** The parties agree that Juror No. 604 and Juror No. 207 were the only two African-American jurors on the jury.

After the note was delivered to the trial court questioning whether Juror No. 604 could be discharged, the trial court spoke to Juror No. 303 and asked if race was interjected into any of the arguments or discussion. Juror No. 303 stated that it was Juror No. 604 who linked her race with her argument. Juror No. 303 denied there had been any jokes related to race, but that there had been a "borderline" insinuation that certain people were voting certain ways based on race, which Juror No. 303 then brought "out into the open."

The trial court also questioned Juror No. 833, who stated race had been interjected into the discussions maybe the first two days, but that the comments were taken the "wrong way" by Juror No. 604. Juror No. 458 also stated that it was Juror No. 604 who brought up the issue of race when there had been a discussion of how Juror No. 207 at times agreed with Juror No. 604, asking "is this because we're black?" The jurors had all agreed that had nothing to do with it. Juror No. 823 also agreed that it was Juror No. 604 who had brought up the issue of race whenever the other jurors did not agree with her. Juror Nos. 439, 330, 243, and 617 echoed the same sentiments as the other jurors, that Juror No. 604 equated a disagreement with her views as an attack on her race.

Juror No. 207, the only other African-American on the jury, was also asked about the issue of race. He acknowledged the issue had come up and when asked if there had been any jokes about race, he stated:

> "I don't even know if it was a joke. I just attributed [it] to age and silliness, but a comment was made that I can relate to what you guys are going through, meaning me and [Juror No. 604], because people have called me the N word or called me a sand N word. And so my thing was, like, what the hell does that have to do with this? [¶] So it didn't go anywhere, because, you know, I just thought it was silly, but I understood, I guess, what he was trying to say. I guess he was trying to relate to the argument. I don't think it was … malice."

In attempting to properly limit its inquiry regarding the content of the jury's deliberations, the trial court's focus was limited to the jurors' conduct during

34.

deliberations — specifically whether or not Juror No. 604 was refusing to deliberate. Once the trial court determined there was sufficient evidence to support its finding that Juror No. 604 should be discharged from the jury, it properly limited its intervention in order to respect the sanctity of the deliberative process. There was no need for further inquiry in this situation on the issue of race, and we reject appellant's claim to the contrary.

IV.      DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING THE REQUEST TO DISCLOSE JUROR IDENTIFYING INFORMATION?

Appellant next contends that the trial court abused its discretion in denying his petition for access to confidential juror information and in failing to follow the procedures set out in Code of Civil Procedure section 237, which prevented him from "developing a motion for new trial based on juror misconduct." We find no error.

*Background*

On August 22, 2019, the jury found appellant guilty on counts 10, 11, 12, 13, and 15, and found true the special circumstance, enhancements, and special sentencing allegations as to those counts. The jury was unable to reach a verdict on counts 1 through 9, and a mistrial was declared as to those counts.

On October 1, 2019, defense counsel filed a motion for new trial arguing, in part, that juror misconduct had occurred.

On October 25, 2019, defense counsel filed a motion to order the disclosure of juror information to "supplement [the] motion for new trial." The motion alleged "good cause" existed for disclosure of juror contact information, as provided by a defense investigator, Mr. Pierce, who had been contacted by Juror No. 207 and told about events "taking place during jury deliberations in this case."

Defense counsel submitted a declaration from the investigator, who alleged that Juror No. 207 claimed: (1) the foreperson did not preside over the deliberations; (2) the jurors, at the outset, stated appellant was guilty and refused to deliberate; (3) the

35.

foreperson made comments regarding the amount of money that had been spent on the trial and that the jury must therefore find appellant guilty; (4) Juror No. 330 professed to be a firearms expert and stated his opinions to his fellow jurors; (5) the jurors attacked other jurors to convince them to vote guilty; (6) the jurors exchanged text messages after the trial regarding a social gathering to celebrate the conviction; and (7) at least one juror conducted an internet search regarding the defense attorneys.

On October 29, 2019, the People filed an opposition to the motion for new trial, arguing appellant "presented no evidence showing misconduct or bias on the part of any juror" and that the declaration was inadmissible and "far from reliable." In its opposition for disclosure of juror information, the People noted that, while defense counsel was already in possession of contact information for Juror No. 207, it had not submitted a declaration from that juror.

Defense counsel subsequently filed additional exhibits to the motion, including screenshots of post-verdict Facebook communications between the jurors arranging to meet for drinks.

A hearing on the motion was held October 31, 2019, at which time defense counsel argued that Juror No. 207 had disclosed that the foreperson "repeatedly raised the issue of the cost of the trial as a reason to convict." Defense counsel also referenced the Facebook posts, arguing that "there was a great deal of social life going on" and "certainly enough to investigate how far that went [and] when it began .…"

The People argued that Juror No. 207 had not come forward on his own or made any statements under oath, but that the defense investigator knew Juror No. 207 through a personal relationship, which led to the investigator's statement. The People argued further that the Facebook messages did not indicate the jurors were "celebrating a conviction" and their communication and research into the issues after the verdict was not improper.

In addressing defense counsel's request for disclosure of juror information, the trial court noted that the investigator's declaration listed "potentially eight issues that were being raised … relative to some possible misconduct," but that, in order to release jury information, there must be a "prima facie showing of a good cause." The trial court then addressed the fact that there had been two juries involved in this case, the initial jury and the jury after Juror No. 604 was discharged and another juror dismissed for hardship. The trial court noted there had been "extensive investigations" into potential misconduct on multiple occasions, including during deliberations.

The trial court noted that the affidavit defense counsel presented in support of requesting juror information was not from Juror No. 207 himself but instead from the defense investigator purporting to say what Juror No. 207 told him. Nevertheless, the trial court explained that it was going to look at the allegations and assume they were true and determine whether they established good cause for releasing the requested information. In going through each of the allegations, the trial court noted that it had evidence that some of the allegations were not true[9] and, regardless, none of the allegations supported a finding of misconduct, keeping in mind that it was "the second jury that convicted [appellant], not the first jury."

The trial court, in denying the motion for release of juror information, found no prima facie showing of good cause for release of the jurors' information based on what had been presented, stating:

---

**9** The trial court noted as to the allegations that there was no requirement that the foreperson "preside over" deliberations, only that they guide them and make sure everyone has a fair chance to be heard; that the refusal to deliberate had been "extensively examine[d]"; that stating someone was guilty from the onset was not "precluded" but "not usually helpful"; that the remarks about the cost of the trial and whether jurors "attacked" other jurors were speculative and questionable as to whether they were admissible; that the allegation that Juror No. 330 professed to be a firearms expert was conclusory; and that the text messages related to the social gathering and research on the attorneys took place after trial and were not relevant.

37.

"I have nothing that leads me to believe — because we had no issues with the second jury. They deliberate[d] for a lengthy period of time and did hang on many of the counts, most of the counts and we did not have any of the issues that we had with that first [jury], so I have every reason to believe they did follow the law."

*Applicable Law and Analysis*

A trial court has "broad discretion" in ruling on a motion for jurors' identifying information, and we therefore review the court's order denying defendant's disclosure request under a deferential abuse of discretion standard. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 604 (*Avila*); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096-1097 (*Townsel*).)

After the recording of a jury's verdict in a criminal trial, the trial court must seal "personal juror identifying information" such as jurors' names, addresses, and telephone numbers. (Code Civ. Proc., § 237, subd. (a)(2).) After a verdict is entered, a criminal defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) Code of Civil Procedure section 237, subdivision (b) provides that "[t]he petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure. (*Avila, supra,* 38 Cal.4th at p. 604; *Townsel, supra,* 20 Cal.4th at p. 1096.)

To demonstrate good cause, a defendant must make a sufficient showing that "talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493; see also *People v. Cook* (2015) 236 Cal.App.4th 341, 345 ["Good cause, in the context of a petition for

38.

disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred.' "].) Moreover, the alleged misconduct must be " 'of such a character as is likely to have influenced the verdict improperly.' " (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322, quoting Evid. Code, § 1150, subd. (a).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook*, at p. 346.) Our Supreme Court has cautioned that requests to access confidential juror records " 'should not be used as a "fishing expedition" to search for possible misconduct,' " and any further evidentiary hearing " 'should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.' " (*Avila, supra,* 38 Cal.4th at p. 604.)

In addition, there are limits on the type of evidence that may be used to make the prima facie showing of good cause. "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.*" (Evid. Code, § 1150, subd. (a), italics added.)

Therefore, neither we nor the trial court may consider *why* the foreperson made the alleged comment regarding the time and cost associated with the trial, or whether the comment had any impact on her or any other juror's ultimate decision to find appellant guilty. (See, e.g., *People v. Jones* (1998) 17 Cal.4th 279, 317 ["Telling a newspaper that '[w]e need a deterrent' does not suggest that the juror, or any juror, considered deterrence in deliberating."]; see also *People v. Hedgecock* (1990) 51 Cal.3d 395, 419 ["when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes" and "[c]onsideration of such a

39.

statement as evidence of those processes is barred"].) Based on the foregoing, the trial court did not abuse its discretion in refusing to release juror information in order to allow defense counsel to go on a "fishing expedition" as to unknown statements that were possibly made in the jury room.

Neither did the trial court abuse its discretion in finding that the defense investigator's declaration regarding Juror No. 330 was insufficient to justify the release of sealed juror information. The declaration stated that Juror No. 207 told the investigator that Juror No. 330 "professed to be a firearm expert and stated his opinion and understanding about firearms throughout the deliberations as if he were a prosecution witness." While a juror commits misconduct by making a "claim to expertise or specialized knowledge of a matter at issue," "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial." (*In re Malone, supra,* 12 Cal.4th at p. 963.) "Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*Ibid.*) Jurors " 'must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts.' " (*People v. Cumpian* (1991) 1 Cal.App.4th 307, 316.)

In *People v. Steele* (2002) 27 Cal.4th 1230, the defendant argued that jurors with military and medical experience offered their expertise during deliberations. While discussing the issue, the Supreme Court made the following pertinent observation:

> "A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that

40.

jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. 'Jurors are not automatons. They are imbued with human frailties as well as virtues.' [Citation.] [¶] "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." (*Steele, supra,* 27 Cal.4th at p. 1266.)

The trial court here found the statement regarding Juror No. 330 "really conclusory," and did not provide any facts upon which the trial court could have found misconduct. The trial court noted that there had been "extensive testimony from firearms experts on bullets, the size of bullets" at trial. We note that nothing in the investigator's statement indicated that Juror No. 330's comments were anything other than expressing an opinion based on the evidence at trial. (*In re Malone, supra,* 12 Cal.4th at p. 963.)

Under these circumstances, the trial court could well conclude appellant had not made a sufficient showing " 'to support a *reasonable* belief that jury misconduct occurred.' " (*Jones, supra,* 17 Cal.4th at p. 317, italics added.) Therefore, we cannot say the trial court's findings in this regard were an abuse of discretion and we deny appellant's request to remand the matter to the trial court to release juror information.

V. DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING APPELLANT'S *MARSDEN* MOTION?

Appellant next contends that the trial court abused its discretion in denying his *Marsden* motion, because defense counsel "had fallen asleep" and was "absen[t]" during "critical portions of the trial." We disagree.

Background

A criminal complaint was filed against appellant on July 27, 2016. Attorney J. Anthony Bryan (Bryan) was appointed to represent appellant and, after a preliminary hearing March 7, 2017, appellant was held to answer the charges on March 14, 2017.

More than two years later, after several motions were filed and argued by both the People and defense counsel, voir dire began on May 13, 2019, and continued for nine

days. On the seventh day of voir dire, one of the potential jurors asked to speak to the court in private. When doing so, the potential juror stated his concern that, "the defense attorney is sleeping, because I actually asked him or talked about him when I was being asked questions yesterday and the other defense attorney[10] had to nudge him to wake him up and I don't think he even knows that I was talking about him."

The trial court noted that it did not see defense counsel sleeping, but that it was possible that it was not paying attention. The trial court then asked the potential juror if he would potentially hold this against appellant or defense counsel. The potential juror stated that he would not hold it against appellant, but that he "may be more inclined to say, [appellant] isn't get[ting] a fair shake. It could go either way." The potential juror then clarified that, if he got on the jury, it would rub him the wrong way, but he did not think it would influence his decisions. The potential juror was subsequently excused by then co-defendant Lee's counsel.

The jury was ultimately sworn on May 23, 2019, opening statements were made on May 29, 2019, and the first witness testified May 31, 2019. Witness testimony continued June 3, 4, 5, 7, and 11, with defense counsel Bryan actively cross-examining the prosecution's witnesses. No witnesses were called June 6 and 10, 2019.

On June 12, 2019, prior to the sixth day of witness testimony, appellant requested a *Marsden* hearing, which was held outside the presence of the prosecutor and codefendant's attorney. At the hearing, appellant stated that he did not think he was being represented to the "best ability," due to Bryan's illness. Appellant felt that Bryan's cross-examination of the witnesses was ineffective because he was "falling asleep" or "dozing off" during the prosecution's questioning of the witnesses. Appellant claimed

---

**10** Referring to defense attorney Gary Turnbull, who was representing then codefendant Lee (see fn. 2).

42.

his family had seen Bryan falling asleep and that he kept "having to tap him and wake him up."

Appellant further argued:

"I know that he's sick, so I really be trying to be hold off and just let him get through what he's going through. At the end of the day, it's still my life, sir. It's ineffective counsel. And, then, when he get up there to examine the witnesses, he's misstating testimony almost every time he get up there and the prosecutor even is saying, oh, no, that's wrong. Mr. Bryan is totally wrong and everybody in this courtroom sees Mr. Bryan falling asleep, everybody, the jurors, my family.

"I'm pretty sure you've seen it and even the bailiffs, they see that.· Everybody that has Mr. Bryan as a client says that Mr. Bryan falls asleep and it's not fair to me. I feel like because I'm facing so much time, my family want me home. At least if we go through this trial, I want to go through this trial with an attorney that's going to be here that's paying attention to everything that's going on with every witness, not just the witnesses ... that's supposed to be victims or witnesses to a crime that happened, every witness, the doctors, everything, sir and I'm not get representing right and there have been times where I wrote stuff down and let Mr. Bryan know that I wrote this down, because he didn't hear it.

"It's been times where the D.A. showed [codefendant's attorney] pictures and Mr. Bryan is right here nodding off and I got to tap him to look at the picture. I feel like it's really not fair to me and my life, sir."

When asked, Bryan responded that appellant had been upset regarding objections the prosecutor had made during cross-examination, and that he had tried to explain to appellant that he could not stop the prosecutor from making such objections. Bryan also stated that he had looked at "every single diagram" and was in possession of the photographs the prosecutor was presenting. Bryan further explained that he had spoken with appellant at the jail and they had discussed his defense strategy, which Bryan disagreed with.

The trial court then asked Bryan about appellant's concerns regarding Bryan dozing off, stating that the court "well may have observed something" and they had taken off days for Bryan's medical appointments. The trial court also brought up the fact that

43.

the earlier noted potential juror believed Bryan had been dozing off. The trial court stated that it was "difficult to tell if somebody [is] dozing off or somebody is just in some sort of deep thought," and while the trial court did not know if Bryan was dozing off, it was aware that Bryan "certainly had [his] eyes closed." The trial court also noted, however, that Bryan was responsive when it was his turn, "which [was] some indication" that he was not asleep.

Bryan stated that appellant had "accused [him] of [sleeping] numerous times when [he] was not." Bryan explained that he did close his eyes to listen, he could hear what was going on and was ready when it was his turn to respond.

The trial court explained that it had been involved in "some lengthy trials" with Bryan in the past and that it could not recall any other times where Bryan may have been sleeping. The trial court stated it did not wish to "delve deeply" into Bryan's "situation," but asked Bryan if there was "something now that you're taking or some medication that they are giving you that you think might cause drowsiness." Bryan responded that he was taking " a lot of stuff," but was "pretty sure" none of them were narcotic.

The trial court noted that it recalled informal discussions in chambers where Bryan may have dozed off, but the discussions were inconsequential, although they had occurred in the middle of the day, "which is of some concern." The trial court asked Bryan "how many times do you think [appellant] may have nudged and you've had some sort of discussion with him that he thought you were sleep?"

Bryan agreed that appellant had nudged him numerous times, but that he was "absolutely not" sleeping "most of the time," but acknowledged that he did not know for sure "about the others." Bryan explained that he had "closed [his] eyes in probably every lawsuit [he had] ever done and sometimes it helps [him] listen." The trial court, noting that it was not a requirement for Bryan to have his eyes open, asked if he was "missing some aspects of the testimony or the evidence or some issues in the case that somehow

44.

are impacting [his] representation." Bryan stated that he knew "what every witness has said."

When the trial court asked appellant if he wished to respond, appellant stated that there had been numerous times he had nudged Bryan and Bryan did not wake up. Appellant insisted that "anybody on the panel or anybody in the audience" would agree that Bryan appeared to be sleeping. Appellant then gave examples of Bryan's tactical choices which he disagreed with, and he had a "gut feeling" he needed a new attorney. Appellant claimed Bryan had been "popping pills, taking prescription medicine, a whole bag full" while in court. Bryan responded that he was taking a medication for restless leg syndrome, but that was the only medication he had taken in the courtroom.

Appellant then asked the trial court if it was possible for the court to "ask anybody that's been in the courtroom if they have seen [Bryan] falling asleep." The trial court stated that it did not need to do so because "people's opinions might differ," but that it was "accepting" appellant's idea that he thought and honestly believed Bryan had dozed off at times and he had to nudge him to wake him up.

Appellant again reiterated his concerns that Bryan was not paying attention to what was going on. He further claimed that Bryan was "sick" and an "older man" and that the issue had been going on for years "since [the] preliminary hearing."

The trial court stated that it had been through "numerous in limine motions" with Bryan in this case and that Bryan had been "relentless in his defense." The trial court noted that there had been one situation prior to jury selection where it believed, in its opinion, that Bryan was asleep, "beyond that, [it had] watched and [it could not] say 100 percent if he was awake or not." The court explained further that it was "assuming for argument's sake, [Bryan] dozed off and he hasn't caught everything that's said in the courtroom," but that, given Bryan's questioning of the witnesses, the trial court could not "say there's evidence within his performance that [led the court] to believe he's missed something significant to the extent that somehow he's not effectively representing, but [it

45.

could not] say 100 percent he hasn't missed something." The trial court noted, however, that even when attorneys are awake they may not be paying attention.

Appellant again stated that he would wake Bryan when he realized the prosecutor was going to be done with a witness, and he would give his notes to Bryan, and appellant did not feel that he should have to assist counsel in such a way.

The trial court again stated that it was not discounting what appellant was saying, but that there was no indication, based on Bryan's performance, that he had dozed off in a way that had impacted his ability to represent appellant. The trial court further noted that Bryan was "zealously representing" appellant in cross-examination and that the court had evidence, based on Bryan's arguments with the prosecutor and codefendant's attorney, as well as issues with the court, "that obviously shows he's paying attention to what's going on."

Appellant again reasserted that Bryan was dozing off, and the trial court explained that that was not enough evidence to find Bryan had not been effectively representing him. The trial court stated that it was going to deny the motion "at this time," but was going to pay "closer attention" to Bryan and appellant could raise the issue in the future if the issue persisted. The trial court invited appellant to take up the issue at any break in the trial, and it asserted that, if he did so, the court would have another *Marsden* hearing.

Appellant did not request another *Marsden* hearing, and, at the end of trial after the jury was unable to reach a verdict as to nine counts, the trial court stated that Bryan had "represented [appellant] to the fullest."

*Applicable Law and Analysis*

"The seminal case regarding the appointment of substitute counsel is *Marsden, supra,* 2 Cal.3d 118, which gave birth to the term of art, a '*Marsden* motion.' " (*People v. Smith* (1993) 6 Cal.4th 684, 690.) *Marsden* held that a defendant has a right to substitute counsel on a proper showing that the constitutional right to counsel would

46.

otherwise be substantially impaired.   (*Marsden, supra,* at p. 123; see *People v. Nakahara* (2003) 30 Cal.4th 705, 718.)

"The legal principles governing a *Marsden* motion are well settled."  (*People v. Lara* (2001) 86 Cal.App.4th 139, 150.)  When a defendant pursuant to *Marsden* seeks substitution of appointed counsel, " 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance.  A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599 (*Taylor*).)  "A trial court should grant a defendant's *Marsden* motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1025.)  "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*People v. Welch* (1999) 20 Cal.4th 701, 728.)

"We review the denial of a *Marsden* motion for abuse of discretion."  (*Taylor, supra,* 48 Cal.4th at p. 599.)  "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*Ibid.*)

The theme dominating appellant's *Marsden* motion was that he alleged Bryan was not paying attention because he was dozing off and therefore not providing him with effective assistance.  It is clear from the record here, which we addressed at length, that the trial court conducted a sufficient inquiry during the *Marsden* hearing.  (See *People v. Silva* (2001) 25 Cal.4th 345, 367.)  As explained by our Supreme Court, "a *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to

47.

warrant counsel's replacement." (*People v. Hines, supra,* 15 Cal.4th at p. 1025.) Here, the trial court allowed appellant to state his concerns at length and permitted Bryan to respond; after appellant's conviction, the trial court concluded Bryan had "represented [appellant] to the fullest." To the extent the trial court made a credibility determination, the court "was 'entitled to accept counsel's explanation.' " (*People v. Rices* (2017) 4 Cal.5th 49, 69.) We find no abuse of discretion on the part of the trial court in finding it unnecessary to replace Bryan.

"The standard for prejudice regarding a denied *Marsden* motion is under *Chapman v, California* (1967) 386 U.S. 18." (*People v. Loya* (2016) 1 Cal.App.5th 932, 945.) Here, even if the trial court erred in denying appellant's *Marsden* motion, the error was harmless beyond a reasonable doubt. The record shows beyond a reasonable doubt appellant would not have achieved a more favorable result had the trial court appointed new counsel to represent him. (See e.g., *People v. Washington* (1994) 27 Cal.App.4th 940, 944.) Bryan was able to get the jury to hang on nine counts and appellant has not argued on appeal that there was insufficient evidence to uphold his convictions on the remainder of the counts, including murder, attempted murder and conspiracy to commit murder.

## VI. MUST THE GREAT BODILY INJURY ENHANCEMENT APPLIED TO COUNT 13 AND THE ATTACHED GANG ENHANCEMENT BE STRICKEN?

Appellant next contends that the trial court erred in imposing firearm (§ 12022.5, subd. (a)) and great bodily injury (§ 12022.7, subd. (a)) enhancements on his conviction on count 13, possession of a firearm by a felon (§ 29800, subd. (a)(1)). He further contends that the trial court erred in imposing a 10-year gang enhancement (§ 186.22, subd. (b)(1)) on that count. We agree and remand for resentencing.

*Background*

Appellant was charged, inter alia, in count 13 of possession of a firearm by a felon (§ 29800, subd. (a)(1)). As to all counts, it was alleged that he had a prior strike (§ 667, subds. (c)-(j)), a prior serious felony (§ 667, subd. (a)), and two prison priors (§ 667.5, subd. (b)). As to counts 1 through 13, it was alleged that appellant had committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). As to count 13, specifically, it was further alleged that appellant used a firearm during the commission of the offense (§ 12022.5, subd. (a)), and that he inflicted serious bodily injury (§ 12022.7, subd. (a)). Appellant was found guilty of the underlying offense and the jury found all three enhancement allegations true.

The trial court sentenced appellant to the upper term of three years on count 13, plus 10 years for the gang enhancement, 10 years for the firearm enhancement, and three years for the great bodily injury enhancement. The sentence on count 13 was stayed pursuant to section 654.

*Applicable Law and Analysis*

Section 29800, subdivision (a)(1) provides, in pertinent part, "[a]ny person who has been convicted of a felony … and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

Section 12022.5, subdivision (a), provides, in pertinent part, that "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or 10 years, unless use of a firearm is an element of that offense." Similarly, section 12022.7, subdivision (a) provides, in pertinent part, that "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

"A gun use occurs 'in the commission of' an offense if the gun use in fact *objectively facilitated* the commission of the offense." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1495, ital. in orig.) " 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm of force by means or display of a firearm in aiding the commission of one of the specified felonies. "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." ' " (*People v. Bland* (1995) 10 Cal.4th 991, 997, quoting *People v. Chambers* (1972) 7 Cal.3d 666, 672.)

In *In re Pritchett* (1994) 26 Cal.App.4th 1754, the defendant struck his former girlfriend in the head with the barrel of a sawed-off shotgun. (*Id.* at p. 1756.) He was convicted of possession of a short-barreled shotgun, and a gun use enhancement under section 12022.5, subdivision (a), was found to be true. On review, the court ordered that the gun use enhancement be stricken because the gun was not used in the commission of the possession offense. (*Id.* at pp. 1757-1758.) The court explained that, "[a]lthough [the defendant] used the shotgun as a club during the possession of it, he did not use it 'in the commission' of his crime of possession. Possession was complete without use of the shotgun. In addition to possessing it, he did use it, but using it as a club in no way furthered the crime of possession." (*Id.* at p. 1757.)

The "commission of a crime under [section 29800] is complete once the intent to possess is perfected by possession." (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1414 [addressing section 12021 which was repealed and continued by section 29800 without substantive change].) "What the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the prescribed weapon." (*Ibid.*) Thus,

appellant's later use of the gun to facilitate the crimes and inflict great bodily injury in no way furthered the already completed crime of possession of the firearm. Thus, the gun-use enhancement (§ 12022.5, subd. (a)) and the great-bodily injury enhancement (§ 12022.7, subd. (a)) on count 13 must be stricken.

We next address the 10-year gang enhancement. Section 186.22, subdivision (b)(1), provides for enhancing a felony sentence as follow: "(A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion. [¶] (B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years. [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

While section 667.5, subdivision (c), lists a violation of section 12022.5 and 12022.7 as a "violent felony," and subject, according to section 186.22, subdivision (b)(1)(C), to an additional 10-year term, once the sections 12022.5 and 12022.7 enhancement allegations are stricken from count 13, the 10-year gang enhancement imposed would not apply.

Section 667.5, subdivision (c), does not list the underlying offense, felon in possession of a firearm as a violent felony, and section 1192.7, subdivision (c), does not list felon in possession of a firearm as a serious felony. (See *People v. Prieto* (2003) 30 Cal.4th 226, 276 [possession of a firearm by a felon in violation of section 29800, subdivision (a)(1) (former § 12021, subd. (a)) " is not a serious felony as defined in

section 1192.7, subdivision (c)"].) Thus, the maximum gang enhancement the trial court was authorized to impose on count 13 was four years.[11] (§ 186.22, subd. (b)(1)(A).)

Accordingly, we remand the matter to the trial court to resentence appellant on count 13.[12]

## VII. WAS APPELLANT INCORRECTLY SENTENCED ON COUNT 11?

Appellant was convicted of premeditated attempted murder in count 11, and the trial court imposed a sentence of 15 years to life, plus 20 years under section 12022.53, subdivision (c). In sentencing appellant on this count, the trial court made no mention of the enhancement finding under section 186.22, subdivision (b).

Where, as here, the gang allegation under section 186.22, subdivision (b) was found true and the underlying felony already carries a life sentence (§ 664, subd. (a) [prescribing life sentence for attempted willful, deliberate and premeditated murder] ), "section 186.22, subdivision (b)(5) ... applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004; accord *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1239 [when crime is gang-related and underlying felony already carries life sentence, "section 186.22, subdivision (b)(5) requires that the defendant serve a minimum of 15 calendar years before being considered for parole"]; *People v. Harper* (2003) 109 Cal.App.4th 520, 527 ["Because Harper was sentenced to a life term, section 186.22 mandates that the alternate punishment of a 15-year parole eligibility be imposed."].)

Appellant contends that the trial court erred when it imposed a sentence of 15 years to life on this count, as the sentence for premeditated attempted murder is an

---

[11]    But see part XI. of the Discussion, in which we address the validity of the gang enhancements in the wake of Assembly Bill 333.

[12]    It is noted that none of the enhancements for count 13 are listed on the abstract of judgment. Upon remand, whatever enhancements remain should be listed correctly.

indeterminate term of life in prison with the possibility of parole. While appellant acknowledges that the gang enhancement attached to that count would have allowed for a 15-year minimum parole eligibility, the "record is unclear regarding why the court sentenced [appellant] to 15 years to life on count 11" and argues that the matter must be remanded to allow the trial court to resentence him. The trial court does have the ability to exercise leniency regarding the gang enhancement. (See *People v. Fuentes* (2016) 1 Cal.5th 218, 222 ["A trial court has the discretion to strike the gang enhancement altogether under section 1385(a)"].) Here, the record indicates that, before sentencing appellant, the trial court stated that the gang enhancement allegations were all found true, but they were moot due to the length of the sentence appellant would be serving on each count.

Appellant further contends that, if the trial court imposed the 15 years to life sentence on count 11 based on the gang enhancement finding, the trial court still erred because section 186.22, subdivision (b)(5) provides that where, as here, a defendant commits a crime punishable by imprisonment for life, the defendant "shall not be paroled until a minimum of 15 calendar years have been served." Thus, the sentence should be stated as a 15-year minimum parole period, not as a sentence of 15 years to life.

Appellant asks that we remand to the trial court to clarify how and why the trial court sentenced appellant to 15 years to life on count 11. Respondent does not oppose appellant's request to modify the sentence on count 11 to a life term with a minimum parole eligibility of 15 years, but does not think remand is necessary, questioning whether there is a practical effect between the sentence imposed by the trial court of 15 years to life and a life term with a minimum parole eligibility of 15 years.

We are already remanding this case to allow the trial court to resentence appellant on count 13. We therefore remand to allow the trial court to clarify or resentence appellant on count 11 as well.[13]

VIII. SHOULD THE ABSTRACT OF JUDGMENT BE MODIFIED TO ACCURATELY REFLECT THE PROCEEDINGS AS TO COUNTS 1 AND 3 THROUGH 6?

Appellant next requests that the abstract of judgment be modified as it mistakenly states that the sentences for counts 1, 3, 4, 5 and 6 were consecutive terms, and that these convictions were by jury rather than by plea. Respondent agrees that the abstract of judgment be modified to reflect this, as do we.

*Background*

On August 22, 2019, a jury found appellant guilty on counts 10, 11, 12, 13, and 15, and a mistrial declared on counts 1 through 9, after the jury was unable to reach a verdict on those counts.

On September 4, 2019, counts 1 and 3 were amended to charge appellant with assault with a firearm (§ 245, subd. (b)). Appellant subsequently plead no contest to five counts of assault with a firearm: counts 1, 3, 4, 5, and 6; counts 2 and 7, 8 and 9, were dismissed in the interest of justice.

The written plea form signed by appellant states that the 17-year total sentence on counts 1, 3, 4, 5, and 6 would be concurrent to the sentence on counts 10 through 15. At the time appellant entered the plea, the People noted that the 17 years would run concurrent to the sentence for the counts found true by the jury. The oral pronouncement of sentence and the minute order correctly reflect that the sentence on count 1, 3, 4, 5, and 6 would be served consecutive to one another, totaling 17 years, but that the 17 years would be served concurrent with count 10.

---

[13] But see footnote No. 11, above.

54.

The abstract of judgment on the determinate sentence, states that the sentence on each of counts 1, 3, 4, 5, and 6 are consecutive, but nowhere does the abstract state that the 17 years is concurrent with appellant's sentence on the remaining counts. The abstract of judgment also states that appellant was convicted by jury of those counts, rather than by plea.

The abstract of judgment is not itself the judgment of conviction and cannot prevail over the trial court's oral pronouncement of judgment to the extent the two conflict. (§§ 1213, 1213.5; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) An appellate court may exercise authority to correct clerical errors, including correcting an abstract of judgment. (*Mitchell, supra,* at p. 185.)

We order that the abstract of judgment be corrected to indicate that appellant entered a plea as to counts 1, 3, 4, 5, and 6. In addition, at the bottom of the abstract of judgment, where it states, "TIME IMPOSED ON THIS ATTACHMENT PAGE," with the total "23" years, should be an indication that the consecutive 17 years for counts 1, 3, 4, 5, and 6 are to run concurrent to the term imposed in count 10.

IX.    MUST THE ABSTRACT OF JUDGMENT BE CORRECTED TO REFLECT THE NAMES OF THE VICTIMS RECEIVING RESTITUTION?

Appellant next contends that the abstract of judgment must be corrected to show the payees of the order for victim restitution. We disagree, finding that this information is adequately included in the probation officer's report.

*Background*

At the time of sentencing, the trial court ordered appellant to pay a total of $1,834 in victim restitution. This amount included $334 to the family of Bryan Anderson and $1,500 to the restitution fund to cover the amount that had been paid out to Katrina Davis. The trial court noted that the amount related to the remaining victims were to be determined. The abstract of judgment notes the total amount of the victim restitution, but

55.

it does not list the breakdown. Instead, the abstract of judgment notes that the victims' names are included in the probation officer's report.

The probation report states that appellant is to pay $334 to Anderson's family and $1,500 to the Victim Compensation and Government Claims Board to reimburse it for moneys paid to Davis. The probation report states further that other amounts are to be determined for the remaining victims.

*Analysis*

The abstract of judgment form provides an option to either list the victims' names on the form itself, or note that the information is provided in the probation report. Here, the latter option was used. Appellant does not explain why the reference to the probation report is insufficient. Because the victims' names and the breakdown of payments are accurately reflected in the probation report, we see no reason to require that the abstract of judgment be amended for this purpose.

X.   IF APPELLANT'S MURDER CONVICTION IS REVERSED, MUST THE TRIAL COURT RE-EVALUATE HIS ELIGIBILITY FOR CONDUCT CREDITS?

Because appellant was convicted of murder, he was not awarded any conduct credits, which are precluded by section 2933.2, subdivision (a), which provides no conduct credits are to be given to "any person who is convicted of murder." Appellant contends that, if his murder conviction is reversed, he would be entitled to conduct credits for counts 1 and 3, 4, 5, and 6, the counts to which he pled no contest.

We, however, find no error requiring reversal of the murder conviction and therefore do not need to address this issue further.

XI.  DOES ASSEMBLY BILL 333 APPLY TO THE SUBSTANTIVE OFFENSE IN SECTION 186.22, SUBDIVISION (A), THE GANG SENTENCING ENHANCEMENT IN SUBDIVISION (B)(1), AND THE SECTION 190.2, SUBDIVISION (A)(22), THE GANG-MURDER SPECIAL CIRCUMSTANCE ENHANCEMENT?

Appellant was convicted, in count 10, of the 2015 murder of Brian Anderson with malice aforethought.  (§ 187.)  The jury also found that appellant committed the murder while participating in, and for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)).  The jury also convicted appellant, in count 11, of the attempted murder of Darnell Dickerson (§§ 664/187, subd. (a)), in count 12, with conspiracy to commit murder (§ 182, subd. (a)(1)), and, in count 15, of active participation in a criminal street gang (§ 186.22, subd. (a)).  As to counts 10, 11, 12, and 13, the jury also found true the allegations that appellant committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).[14]

In supplemental briefing, appellant contends Assembly Bill 333 requires reversal of the gang-based findings in this case (§ 186.22, subds. (a) & (b)(1)), as well as the gang-based special circumstance findings (§ 190.2, subd. (a)(22)).  The People agree that the amendments to section 186.22 should be applied retroactively, but contend the error in this case is harmless.  The People also contend Assembly Bill 333 unconstitutionally amended section 190.2, subdivision (a)(22).

We agree that the amendments to section 186.22 apply retroactively.  Section 186.22, subdivisions (a) and (b)(1) provide for additional punishment when the defendant is found guilty of participation in a criminal street gang (§ 186.22, subd. (a)) and the defendant committed the offense(s) for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)).  Under *In re Estrada* (1965) 63 Cal.2d 740, absent evidence to the contrary, we presume that the Legislature intended such ameliorative

---

[14]  But see part VI. of the Discussion, above, addressing the gang enhancement allegation in count 13.

changes to the criminal law to apply to all criminal cases not yet final on appeal. (*Id.* at pp. 744-746; *People v. Nasalga* (1996) 12 Cal.4th 784, 792; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) Assembly Bill 333 is an ameliorative amendment that increases the threshold for imposition of a gang enhancement. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez 2021*); accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.) Because Assembly Bill 333 is silent regarding retroactivity, under *Estrada*, we presume it applies retroactively to all nonfinal cases on appeal, including this one. (See, e.g., *Lopez 2021*, *supra,* at pp. 343-344; *People v. Sek* (2022) 74 Cal.App.5th 657, 667 (*Sek*).)

We also agree that the amendments require the reversal of the gang conviction and enhancements under section 186.22, and, despite the People's argument (which we discuss below), also apply to the gang-murder special circumstance findings under section 190.2, subdivision (a)(22).

Before Assembly Bill 333 was enacted, the statute defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons, ... having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f); Stats. 2017, ch. 561, § 178.) To establish a "pattern of criminal gang activity," the prosecution needed to prove only that those associated with the gang committed two or more predicate offenses within a period of three years and that the offenses were committed on separate occasions, or by two or more persons on the same occasion. (§ 186.22, former subd. (e); *Menifee v. Superior Court* (2020) 57 Cal.App.5th 343, 362.) A predicate offense could be established by evidence of the charged offense, and, in most cases, it was unnecessary to prove that the predicate offenses were gang related. (*Menifee, supra,* at p. 362; *People v. Rodriguez*

(2022) 75 Cal.App.5th 816, 822 (*Rodriguez*); *People v. Garcia* (2020) 46 Cal.App.5th 123, 165.)

Assembly Bill 333 increased the evidentiary requirements to prove a gang-related enhancement in several respects.  First, it narrowed the definition of " 'criminal street gang' " to "an ongoing, organized association or group of three or more persons ... whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)  The statute now requires the prosecution to prove that two or more gang members committed each predicate offense.  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).)

Second, Assembly Bill 333 created stricter requirements to prove "a pattern of criminal gang activity."  Under the new legislation, (1) the last predicate offense must have occurred not only within three years of the prior predicate offense, but also within three years of the date of the currently charged offense; (2) the predicate offenses must have "commonly benefited a criminal street gang," and that benefit must be "more than reputational;" and (3) the currently charged offense cannot be used as a predicate offense. (§ 186.22, subds. (e)(1)-(2), (g); *Lopez 2021, supra,* 73 Cal.App.5th at p. 345; *Rodriguez, supra*, 75 Cal.App.5th at pp. 822-823.)

The evidence presented regarding the pattern of criminal gang activity consisted of several members of the Bakersfield Police Department testifying regarding past criminal conduct of members of the County Boy Crips.  The predicate offenses that were presented involved Country Boy Crips members Jimmy Baker, Tevin Williamson, and Adolphus Newell.

Officer John Billdt testified that, on February 10, 2013, Flowy Beam was shot and killed in the area of Roy's Market in Kern County.  Officer Ryan Kroeker testified that Baker was subsequently arrested and convicted of Beam's murder.

Officer Robert Woods testified that, on March 16, 2013, he and his partner David Brooks were on patrol in an area known to be "within the traditional boundaries of the

East Side Crips." While on patrol, the officers observed a vehicle and, as the vehicle passed the officers, the two occupants attempted to duck out of view. The vehicle then made an abrupt turn and took off; Officers Wood and Brooks pursued the vehicle and attempted to make a traffic stop. The vehicle continued to accelerate and eventually crashed into a fence. One of the occupants, Williamson, exited the vehicle, holding a handgun and fled on foot. Another officer subsequently found a nine-millimeter handgun in the area and Williamson was apprehended and later convicted of possession of a handgun.

Detective Keegan Gavin testified that, on July 5, 2014, he was in the area of 20th and K street, a common hangout for the Country Boy Crips, when he observed Newell walking through the parking lot. When Newell saw Detective Gavin, he removed a "dark colored object" from his waistband, and fled. Newell was subsequently apprehended and a firearm located in the area where he fled. When Newell was arrested, he was wearing a T-shirt with airbrushed writing referencing subsets of the East Side Crips. Newell was later convicted of possessing the gun that had been recovered.

Officer Michael Malley testified as an expert in the area of criminal street gangs and opined, based on other officer's contact with appellant and appellant's tattoos and social media, that appellant was an active member of the Country Boy Crips on July 9, 2015. Officer Malley testified that the primary activities of the Country Boy Crips are "[m]urders, assaults with deadly weapons, robberies, carjackings, burglaries, criminal threats, witness intimidation as well as possession of stolen property and illegal firearms, possession as well as the possession for sale and the sell[ing] of illegal drugs." Officer Malley opined that the Country Boy Crips has a reputation of being violent and that firearms are a tool that allow its members to "commit a number of primary activities," "control victims," and "victimize their rivals" as well as provide mutual protection for the Country Boy Crips.

60.

Officer Malley referenced the three predicate offenses that had been introduced into evidence earlier by other officers and opined that Baker, Williamson, and Newell were all active members of the Country Boy Crips. Officer Malley explained that Baker's offense involved a murder that occurred in the territory of a rival gang, the East Side Crips; that Williamson's offense involved possession of a firearm and gang participation also occurring in the territory of a rival gang, and he then fled to a location that was common for Country Boy Crips members to use in an attempt to escape police; and that Newell was in possession of a firearm at a "known" Country Boy Crips hangout and was wearing a shirt disrespecting his rival gang.

Here, we find the evidence presented at trial was insufficient to prove the gang enhancements under the new law. While the prosecution's expert testified about several ways in which a crime would benefit a criminal street gang, at least one of these (to "control victims" and perhaps "victimize their rivals") was reputational. In closing arguments, the prosecutor argued appellant's crimes benefited the gang because "the benefit of the gang," is that "You are feared. You are a force. You are in power."

Consistent with former section 186.22, the trial court instructed the jury in this case on the gang enhancement, and informed the jury that "[t]he crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related." (See CALCRIM No. 1401.) The jury instructions given did not reflect the change in the law that the common benefit from the offense needs to be something more than reputational (Assem. Bill 333, subd. (e)). While there was evidence of benefits to the gang that went beyond reputational, we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its bases for finding the enhancements true.

Also, there was no evidence any of the predicate offenses were committed by two or more gang members. (See CALCRIM No. 1401.) The jury was also not prohibited from relying on the currently charged offenses to establish a predicate offense.

61.

The jury was not asked to, and therefore did not make, the factual determinations now required to convict of a substantive offense or impose a gang enhancement under section 186.22. We therefore conclude the section 186.22, subdivision (a) conviction and subdivision (b) enhancements must be vacated. "The proper remedy for this type of failure of proof — where newly required elements were 'never tried' to the jury — is to remand and give the People an opportunity to retry the affected charges." (*E.H., supra,* 75 Cal.App.5th at p. 480; accord *People v. Lopez* (2022) 82 Cal.App.5th 1, 14 (*Lopez 2022*)[15]; *Sek, supra,* 74 Cal.App.5th at p. 669; *Rodriguez, supra,* 75 Cal.App.5th at pp. 822-823 & fn. 19.)

The changes brought by Assembly Bill 333 also require that we vacate the gang-murder special circumstance findings in this case (§ 190.2, subd. (a)(22)). Section 190.2, subdivision (a)(22) requires proof beyond a reasonable doubt that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." The express reliance on the gang-murder special circumstance statute on the definition of a criminal street gang in section 186.22, means that appellant is entitled to the benefit of this change in the law as to the special circumstance finding under section 190.2, subdivision (a)(22). (*Lopez 2021, supra,* 73 Cal.App.5th at p. 347.)

Appellant and the People disagree about whether Assembly Bill 333's amendments apply to the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). Appellant contends they do; the People say they do not. We conclude the amendments apply to the section 190.2, subdivision (a)(22) findings and reverse that finding as well.

---

[15] We refer to two separate cases both titled *People v. Lopez*. In order to avoid confusion, we refer to *People v. Lopez* (2021) 73 Cal.App.5th 327 as *Lopez 2021*, and *People v. Lopez* (2022) 82 Cal.App.5th 1 as *Lopez 2022*.

There is a split of authority on this issue. In *Lopez 2021, supra,* 73 Cal.App.5th 327, the Second Appellate District, Division Eight, concluded "Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22" including section 190.2, subdivision (a)(22). (*Lopez 2021, supra,* at p. 346.) Section 190.2, subdivision (a)(22) was enacted as part of Proposition 21, an initiative measure approved by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64-65.) Section 190.2, subdivision (a)(22) makes first degree murder a capital crime if " '[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22,* and the murder was carried out to further the activities of the criminal street gang.' " (*Lopez 2022, supra,* 82 Cal.App.5th at p. 14.)

The Second Appellate District's *Lopez 2021* opinion holds that because "the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity," the requirements for proving a gang special circumstance under section 190.2, subdivision (a)(22) have likewise changed. (*Lopez 2021, supra,* 73 Cal.App.5th at p., 347.)

In *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted October 19, 2022, a divided panel in our district reached the opposite conclusion. The *Rojas* majority held that "[b]ecause Assembly Bill 333 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2," (*Rojas, supra,* at p. 555) it is "unconstitutional to the extent it would amend that initiative." (*Id.* at p. 557.)

The *Rojas* majority relied on the fact that California voters restricted the Legislature's ability to amend the provisions of Proposition 21. The majority's reasoning was as follows: "While the Legislature was free to amend Proposition 21 ..., it could only do so with a two-thirds vote in each house. (Voter Information Guide, Primary Elec.

63.

(Mar. 7, 2000) text of Prop. 21, ... § 39, p. 131.)  Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21." (*Rojas, supra,* 80 Cal.App.4th at p. 555.)  In practical effect, *Rojas* holds that a special circumstance murder allegation under section 190.2, subdivision (a)(22) may be proven based on a different, less restrictive definition of a "criminal street gang" than is found in the current version of section 186.22.  (See *Rojas, supra,* at p. 558 [holding Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22)].)

In *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted October 19, 2022, Division Four of the Second District concluded Assembly Bill 333 does not unconstitutionally amend section 190.2, subdivision (a)(22).  Focusing on the question of voter intent, the *Lee* court opined there is "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term ' "criminal street gang" ' in the gang-murder special-circumstance statute." (*Id.* at p. 245.)  Accordingly, *Lee* holds that the term " 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Ibid.*)

In *Lopez 2022, supra,* 82 Cal.App.5th 1, relying on *Lee*, a panel of justices from this district different from the one that decided *Rojas* rejected a similar argument that Assembly Bill 333 improperly amended the gang conspiracy statute, section 182.5, enacted as part of Proposition 21.  The court determined there was no time-specific provision in Proposition 21 for section 182.5 as there was for other provisions of the criminal law.  (*Lopez 2022, supra*, at pp. 23-24.)  The court concluded, "[W]e agree with *Lee*'s conclusion that 'the electorate clearly knew how to express the intent to freeze a statutory definition,' " and "[t]he absence of such time-specific language in section 182.5 leads to our rejection of the People's claim." (*Lopez 2022, supra,* at pp. 24-25.)

The People submit that Assembly Bill 333's "amendment to section 186.22, subdivisions (e) and (f), appears to be an unconstitutional amendment to the gang-murder special circumstance created by the voters via Proposition 21." Although the People's supplemental briefing was filed before *Rojas* was published, their argument tracks the rationale espoused by the *Rojas* majority. Likewise, the People claim there are now two statutory definitions of a "criminal street gang." Although the gang conspiracy statute incorporates the definitions set forth in section 186.22, subdivision (e) and (f), the People argue those references must be read to mean as the provisions existed prior to Assembly Bill 333.

The People urge us to adopt the *Rojas* court's view, while appellant, in his supplemental reply brief, urges us to follow the reasoning in *Lee*. Obviously, since both *Rojas* and *Lee* have been granted review by our Supreme Court, this issue has not been decided. We, however, agree with and endorse the reasoning of *Lee*. Applying that reasoning here, the section 190.2, subdivision (a)(22), special circumstance findings must also be reversed.

We strike the findings under both section 186.22, subdivisions (a) and (b)(1) and section 190.2, subdivision (a)(22), and remand the matter to afford the People the opportunity to retry these allegations under the current law.

## DISPOSITION

On count 10, we vacate the true findings on the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)), the gang enhancement allegation (§ 186.22, subd. (b)(1)); and therefore also the gang-related firearm enhancement allegations (§ 12022.53, subds. (c)-(d), (e)(1)), and strike the related sentences.

On counts 11 and 12, we vacate the true findings on the gang enhancement allegations (§ 186.22, subd. (b)(1)) and therefore also the gang-related firearm enhancements (§ 12022.53, subds. (c)-(d), (e)(1)), and strike the related sentences.

65.

On count 13, we vacate the personal use of a firearm allegations (§§ 12022.5, subd. (a); 12022.7, subd. (a)) and the gang enhancement allegation (§ 186.22, subd. (b)(1)), and strike the related sentences.

On count 15, we vacate the active participation in a criminal street gang allegation (§ 186.22, subd. (a)) and therefore also the personal use of a firearm allegations (§§ 12022.5, subd. (a); 12022.7, subd. (a)), and strike the related sentences.

We remand to the superior court. On remand, the People shall decide whether to retry appellants on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), the active participation in a criminal street gang allegation (§ 186.22, subd. (a)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (c)-(d), (e)(1)).

If the People elect not to retry these allegations, the superior court is directed to resentence appellants according to applicable law.

If the People decide to retry appellants on the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)), the active participation in a street gang offense (§ 186.22, subd. (a)), gang enhancement allegations (§ 186.22, subd. (b)), the personal use of a firearm allegations (§§ 12022.5, subd. (a); 12022.7, subd. (a))[16], and the gang-related firearm enhancement allegations (§ 12022.53, subds. (c)-(d), (e)(1)), and if any such allegations are found true, the court shall resentence appellant according to applicable law.

Upon determination as to the status of these allegations (no retrial, or retrial and final resolution), the clerk of the superior court shall prepare an amended abstract of judgment for appellant reflecting the appropriate modifications, as set forth above and

---

[16]    But not as to count 13, see part VI. of the Discussion, above.

addressed in part VIII., and forward it to the California Department of Corrections and Rehabilitation.

As modified, the judgment is affirmed.


FRANSON, Acting P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.